Dana GARNER, Petitioner

v.

PENNSYLVANIA HUMAN RELATIONS COMMISSION, Respondent.

Commonwealth Court of Pennsylvania.

Argued Oct. 14, 2010.

Decided Feb. 24, 2011.

---

Yuval Rubinstein, Washington, D.C., for petitioner.

Lisa M. Kaplan, Assistant Chief Counsel, Philadelphia, for respondent.

Frank A. Chernak, Philadelphia, for intervenor Comcast of Willow Grove, Inc.

BEFORE: LEAVITT, Judge, and BROBSON, Judge, and BUTLER, Judge.

OPINION BY Judge LEAVITT.

Dana Garner petitions for review of an adjudication of the Pennsylvania Human Relations Commission dismissing his discrimination complaint. The Commission concluded that Garner's evidence did not establish a *prima facie* case of race-based discrimination on the part of his employer, Comcast of Willow Grove, Inc. (Comcast). Garner contends that Comcast disciplined its employees differently, depending upon the employee's race. The Commission found, however, that Garner's evidence simply did not support the inference that race was a factor in Garner's dismissal and, thus, he did not make a *prima facie* case. Concluding that the Commission did not err, we affirm.

### Background.

On May 13, 2005, Comcast dismissed Garner, a Line Technician, for "unauthorized possession of [Comcast] property . . . in direct violation of our policy on employee [c]onduct." Reproduced Record at 316a (R.R. ___). The written policy in question expressly prohibited the "[u]nauthorized use of Comcast property, including, but not limited to the unauthorized use of Comcast vehicles" and "[t]aking, receiving, selling, concealing or possessing without authorization, property belonging to Comcast, co-workers, customers, contractors or vendors or assisting others in such actions, including failing to report knowledge of such actions." R.R. 337a. Garner was dismissed for taking a ladder belonging to Comcast and leaving it at his rental property for several weeks.

Garner filed a complaint with the Commission charging Comcast with racial discrimination. Garner's complaint asserted that, as an African–American, he was a member of a protected class; that he was qualified for the position he held; and that he was dismissed for violating the above-cited Comcast policy where a similarly situated person, not a member of this protected class, was not dismissed. The Commission determined that there was probable cause to believe that Garner was the victim of racial discrimination and appointed a hearing examiner to convene a hearing.

At the hearing, Garner testified that he was hired by Comcast in 1990 as a Service Technician, in which position he attended to cable service problems in individual homes and businesses. Nine years later,

he was promoted to Line Technician and transferred from the Philadelphia office to the Willow Grove office. Line Technicians address service issues that affect a "whole block or whole neighborhood." R.R. 61a. Garner was assigned a truck, tools, a 30–foot extension ladder and an A-frame ladder. Garner used the ladder rack to store his 30–foot ladder; it was his practice to keep the A-frame ladder in the office work yard and take it when needed. As did all technicians, Garner took his equipment and truck home nightly.

In April 2005, Garner took his A-frame ladder from work to use to hang drywall at one of his rental properties and left it there. Garner testified that other employees also took ladders home for personal use.

Several weeks later, Comcast held a meeting of Service Technicians at the Willow Grove office. Garner did not participate in the meeting, but he happened to be present in the room and overheard the discussion about an A-frame ladder reported missing by Chris Cocola, a Service Technician. Garner testified that he did not realize that the ladder under discussion was the one he had taken to his rental property. Garner thought that the A-frame ladder he was using was the one issued to him by Comcast.

One week later, Anthony J. DeFabis, Garner's supervisor, held a meeting of the Line Technicians. DeFabis asked if anyone had seen a ladder or taken one from the premises. Garner testified that he did not respond because he did not think the ladder he had taken to his rental property was "missing."

Thereafter, Garner was called to meet with DeFabis and Anitha Verghese, the human resource manager for Willow Grove. Verghese asked Garner if he knew anything about a missing ladder. He responded that he had taken an A-frame ladder, which he believed to be his own ladder, not the one assigned to Cocola. The next day Verghese dismissed Garner, explaining that he lacked integrity and was "untrustworthy," having been given a chance to "come clean" and failing to do so. R.R. 79a.

On cross-examination, Garner acknowledged that he had never been the target of racial *animus* in the workplace, by way of offensive comments or otherwise. He was then asked about four prior disciplinary actions.

The first dated to 1996, when Garner, under the influence of cocaine, caused an accident while driving Comcast's truck. Comcast enrolled Garner in a drug rehabilitation program, after which he returned to his job. The second discipline occurred in 1997, when Garner's New Jersey driver's license was suspended for driving while intoxicated. He did not report his license suspension to his supervisor and continued to drive Comcast's truck without a license. When Comcast discovered the license suspension, it moved Garner to a warehouse job until his license was restored. The third discipline took place in 2004, when he was reprimanded for not wearing his hardhat while working, in violation of company policy. The final discipline also took place in 2004, when Garner left the scene of a fender-bender accident that occurred while Garner was driving his Comcast truck. Garner did not report the accident, and Comcast learned of it from the police. As a result, Comcast issued Garner a written warning, which stated explicitly that the next disciplinary incident could result in discharge.

Gary Lawson, a Service Technician who is African–American, testified for Garner. He testified that Garner was well-liked, respected and regarded as trustworthy. Lawson testified that he, like many em-

ployees, took his truck and tools home at night and that no employee, other than Garner, had ever been disciplined for taking and using tools at home without permission. However, Lawson acknowledged on cross-examination that he had never taken his Comcast equipment to a property, not his home, and then left it there for several weeks. Lawson also testified that he did not know about Garner's previous disciplines.

William Hannigan, who is white, next testified. Hannigan had worked as a Line Technician and as a Service Supervisor for Comcast. He testified that the technicians took their trucks and equipment home with them each day. He occasionally used the tools for personal use, citing, for example, the use of the ladder to clean his gutters. He never asked permission to do so and was not aware of a company policy on the issue. Further, he was not aware of any employees being disciplined for putting Comcast tools to personal use. Hannigan never left any tools or equipment at his home during the work day; he immediately returned any tools he used at home to his truck.

Hannigan then testified about the workplace surveillance tapes.[1] Hannigan supervised Cocola, and when Cocola reported the missing ladder to him, Hannigan sought permission to view the tapes. The tape from the day Cocola realized his ladder was gone showed Garner taking an A-frame ladder leaning against the wall, in the spot where Cocola had reported placing his ladder, and putting it in his truck.

Garner offered several exhibits into evidence, which were admitted by the hearing examiner.[2] These exhibits purported to show disparate treatment of Comcast employees according to their race.

Complainant Exhibits 10 and 11 consisted of copies of two "final written warning" letters issued to employees who had falsified work orders. Both of the recipients of these warnings were white employees.

Garner then offered two statistical exhibits. The first, Complainant Exhibit 9, prepared by Comcast, consisted of two documents. The first document listed, by race, 79 technician employees in the "Philadelphia and Suburban system" who had been dismissed between 2003 and 2005. R.R. 349a. Of the 79 employees, 39 were white, 30 were African–American and 10 were Hispanic. Stated otherwise, 40% of those dismissed over a two-year period were African–American. The second document in Exhibit 9 listed all of the active Service and Line Technicians by their race in the Philadelphia Suburban area as of one point in time: May 2005. The total was 693, of which 195, or 28%, were African–American. The two documents in Exhibit 9 also listed the date of hire of each employee.

The second statistical exhibit offered by Garner, Complainant Exhibit 13, was a letter from Comcast's counsel to the Human Relations Commission responding to the Commission's request for data and information about Garner's dismissal. The

1. The "tape" consists of four cameras that take snapshots of the garage in rotation and save them to a hard drive. A DVD showing the snapshots was admitted into evidence.

2. Garner called David E. Brier, Senior Counsel for Comcast, as a witness to authenticate documents, but the authentication was established by stipulation. The hearing examiner permitted Garner to question Brier about the

identity of the individual at Comcast responsible for the compilation of the data shown on the documents. In the end, Garner's exhibits were admitted by agreement of the parties. Respondent Exhibit 8 consisted of copies of three dismissal letters issued to white employees who had, *inter alia*, used company property without authorization.

letter reported, *inter alia,* that employees in "Willow Grove and Philadelphia" were diverse in race: 100 (or 44%) were African–American, 41 (or 18.1%) were Hispanic, six (or 2.6%) were Asian, and 80 (or 35.2%) were white. R.R. 375a. The letter identified 11 employees, including Garner, who had been "disciplined" for theft, dishonesty or unauthorized use of Comcast property. Seven were African–American, three were Hispanic and one was white.

At this point in the hearing, Garner's final witness, DeFabis, had not yet arrived. The hearing examiner suggested that Comcast present its case, while the record was kept open for DeFabis' testimony. Comcast responded with a motion for a non-suit, arguing that Garner had failed to make out a *prima facie* case of discrimination. The hearing examiner announced that he could not rule on the motion because Garner's final witness had not yet appeared. Comcast was directed to present its rebuttal evidence, which consisted of testimony from two witnesses, while the record remained open for receipt of Garner's final evidence.

Comcast called Anitha Verghese, the human resource manager for Willow Grove, whose responsibilities include making recommendations for employee discipline. Verghese testified that after learning what appeared on the surveillance tape, she spoke to Garner. She asked him what he knew about a missing ladder, and he replied that he knew nothing. When she asked him if he had taken a ladder from the property, he replied that he had not. When she informed him that she had a tape of him removing a ladder, he replied, " 'Oh, that ladder. I have that in my garage in North Philadelphia.' " R.R. 234a. Garner offered to return the ladder immediately. Verghese responded by stating, "this does not look good. Do you realize that this is considered stealing and

it's not good." R.R. 235a. Garner asked if he would be terminated. She responded that he would be contacted in a few days. She testified that Garner never stated at this meeting that he believed, mistakenly, that the ladder he had taken to his rental property was his, not Cocola's.

After the meeting, Verghese reviewed Garner's employment history, which included driving a Comcast truck under the influence of cocaine, driving a Comcast truck after his license was suspended and leaving the scene of an accident while driving his Comcast truck. Each incident was, in itself, a ground for dismissal. Verghese concluded that Garner had lied about the ladder, knowing that Cocola would have to pay for the ladder's replacement. Not until he was confronted with the surveillance tapes did Garner admit he had a ladder at his rental property. Based on Garner's history of misconduct and lack of honesty about the ladder, Verghese recommended that Garner be fired.

Next, Comcast called Robin Proctor, Comcast's Regional Vice–President for Human Resources, to testify. Proctor, who is African–American, testified that the decision to dismiss Garner took place in the course of a conference call, which included Verghese and other Comcast personnel. Proctor explained that she had a good relationship with Garner and was reluctant to fire him. However, his willingness to let Cocola bear the cost of the missing ladder and his lack of honesty were, she concluded, inexcusable. Noting that she and Garner were of the same race, she testified, without equivocation, that race was not a factor in the decision to fire Garner.

Comcast then made another motion for a non-suit. The hearing examiner refused to rule on the motion, again noting that Garner had not yet completed his case. Because DeFabis still had not arrived at

the hearing, Garner requested to have De-Fabis' deposition testimony admitted into evidence. The request was granted by the hearing examiner.

DeFabis' deposition established that he met Garner in 1989 and that the two were friends who socialized together with their families. DeFabis became a supervisor in 2004, responsible for Garner and four other employees. DeFabis identified problems with Garner's performance, such as his leaving work to attend to personal business and using his work phone for his personal online business. DeFabis directed Garner not to run his business on Comcast time, but DeFabis did not recommend that Garner be disciplined for this conduct.

When DeFabis learned about the surveillance tape, he watched it himself to make sure it showed Garner taking the ladder. DeFabis then asked Garner three times if he had any information on a missing A-frame ladder, explaining that he wanted to give Garner, his friend, a chance to tell the truth. When DeFabis remarked that Cocola would have to pay for the ladder if it was not found, Garner replied that Cocola probably took the ladder. DeFabis testified that at the meeting with Garner he attended with Verghese, Garner admitted that he had the ladder; did not know why he had not acknowledged this fact earlier; and never claimed that he thought he had taken his own A-frame ladder.

After the meeting, Garner apologized to DeFabis for letting him down and asked whether he would be fired. DeFabis told Garner to go home and hope for a final written warning. DeFabis had no input into the decision to dismiss Garner. However, he agreed with the decision.

With the admission of the DeFabis deposition, the hearing examiner closed the record. The hearing examiner did not rule on Comcast's motion for a non-suit, directing the parties to address the issue of whether Garner made out a *prima facie* case of racial discrimination in their post-hearing briefs.

### Hearing Examiner Recommendation.

The hearing examiner began his recommended decision with a review of the standards for making out a *prima facie* case of racial discrimination. They require a plaintiff to establish (1) that he is a member of a protected class; (2) that he is qualified for the position he held; (3) that he was terminated; and (4) that he was terminated under circumstances that gave rise to an inference of discrimination. There was no dispute that Garner satisfied the first three prongs, leaving only the question of whether Garner's dismissal gave rise to an inference of racial discrimination. The hearing examiner then reviewed the evidence on the circumstances surrounding Garner's dismissal.

The hearing examiner found that none of Garner's witnesses proved that white employees were treated more favorably than African–American employees. Garner's witnesses testified that Line Technicians were permitted to take their tools home and use them; however, they also testified that they returned their tools to the truck for use the next day. Indeed, Lawson testified that he had never taken a work ladder to a site other than his home or left it there for several weeks. By contrast, Garner took an A-frame ladder belonging to Comcast to his rental property, where he left it for several weeks.

The hearing examiner also found the discipline of two white employees that were covered in Complainant Exhibits 10 and 11 not comparable. Both were disciplined, but not terminated, for misusing company property; however, neither had a prior disciplinary record. By contrast, Garner had been previously disciplined for

serious violations and been issued a written warning before the final incident. Further, the discipline of the two white employees had taken place many years earlier, making the evidence stale and of limited relevance.

The hearing examiner then reviewed Garner's statistical exhibits. Complainant Exhibit 13 identified 11 technicians, including Garner, from the Willow Grove and Philadelphia area who had been "disciplined" for unauthorized use of equipment and related offenses between May 2003 and May 2005. Seven of them were African–American. However, the document did not identify the type of discipline, *i.e.,* a warning or a termination, and did not identify the type of conduct that prompted the discipline. Thus, the hearing examiner found the discipline numbers in Complainant Exhibit 13 too vague to support any findings.

Complainant Exhibit 9 was offered to show the race of Comcast employees in the "Philadelphia and Suburban systems." The total number of employees was 693, of which 195, or 28%, were African–American as of a point in time: May 2005. The exhibit also showed that 40% of the 79 employees dismissed between May 2003 and May 2005 were African–American. The hearing examiner found that these numbers did not prove intentional discrimination. Further, he found that Complainant Exhibit 13, which covered Willow Grove and Philadelphia, where Garner

worked, more relevant. It showed that 44% of the workforce was African–American. This ratio was comparable to the 40% African–American dismissal rate.

The hearing examiner found that Garner's statistical exhibits did not support an inference of racial discrimination. The data consisted of "raw numerical comparisons offered without a meaningful attempt to explain the background to the numbers." R.R. 19a. He also found Garner's statistics "general and incomplete." R.R. 17a.

Because Garner's evidence did not show that he was terminated under circumstances that gave rise to an inference of racial discrimination, the hearing examiner held that Garner did not make a *prima facie* case of racial discrimination. Accordingly, the hearing examiner recommended that Comcast's motion for compulsory non-suit be granted. The Commission accepted the hearing examiner's recommendation. It adopted the hearing examiner's findings of fact and conclusions of law, and it dismissed Garner's complaint.

### Appeal.

Garner now seeks this Court's review and raises three issues.[3] First, Garner argues that the Commission erred in granting Comcast's motion for compulsory non-suit in light of the fact that Comcast presented a defense. Because both parties presented evidence, Garner argues

---

**3.** Our scope of review from a determination of the Commission is whether it is in accordance with the law, whether constitutional rights have been violated and whether the findings are supported by substantial evidence. *Spanish Council of York, Inc. v. Pennsylvania Human Relations Commission,* 879 A.2d 391, 397 n. 15 (Pa.Cmwlth.2005).

Our standard of review is whether the Commission's grant of a non-suit constituted an abuse of discretion or an error of law. *Uber*

*v. Slippery Rock University of Pennsylvania,* 887 A.2d 362, 365–66 (Pa.Cmwlth.2005). "A judgment of nonsuit may be entered only in the clearest cases, and a plaintiff must be given the benefit of all favorable evidence, together with all reasonable inferences of fact arising therefrom, and any conflict in the evidence must be resolved in the plaintiff's favor." *Asbury v. Port Authority Transit of Allegheny County,* 863 A.2d 84, 88 n. 4 (Pa. Cmwlth.2004).

that it was incumbent upon the Commission to reach the ultimate question of whether Garner's dismissal resulted from unlawful racial discrimination. Second, Garner argues that the Commission erred because it required him to present direct evidence of discrimination, which is not appropriate in a mixed-motive theory of discrimination, such as that pursued by Garner. Third, Garner argues that the Commission erred in rejecting his statistical and comparator evidence of racial discrimination.

**Pennsylvania Human Relations Act.**

Garner asserts that his dismissal from his job as Line Technician violated the Pennsylvania Human Relations Act (Act), Act of October 27, 1955, P.L. 744, *as amended*, 43 P.S. §§ 951–963. Specifically, he contends that Comcast violated Section 5(a) of the Act, which makes it unlawful for any employer "because of the race ... of any individual ... to discharge from employment such individual...." 43 P.S. § 955(a).[4]

 Our Supreme Court has adopted the analytical model for determining the merits of an employment discrimination case established by the United States Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).[5] Briefly, that analytical model requires the complainant to make a *prima facie* case of discrimination by showing that:

(i) he is in a protected class; (ii) he is qualified for the position; (iii) he suffered an adverse employment action; and (iv) he was discharged under circumstances that gave rise to an inference of discrimination.

*Spanish Council of York, Inc. v. Pennsylvania Human Relations Commission*, 879 A.2d 391, 397 (Pa.Cmwlth.2005). Once the complainant meets this burden, it is the employer's burden to "articulate some legitimate, non-discriminatory motive for its action." *Id.* If the employer does so, the burden returns to the complainant to demonstrate that the employer's stated reasons for the employment decision were pretextual. *Id.*

Here, the Commission held Garner did not make out a *prima facie* case of racial discrimination.

---

4. Section 5(a) of the Act states, in relevant part, as follows:

*It shall be an unlawful discriminatory practice*, unless based upon a bona fide occupational qualification, or in the case of a fraternal corporation or association, unless based upon membership in such association or corporation, or except where based upon applicable security regulations established by the United States or the Commonwealth of Pennsylvania:

(a) For any employer because of the race, color, religious creed, ancestry, age, sex, national origin or non-job related handicap or disability or the use of a guide or support animal because of the blindness, deafness or physical handicap *of any individual* or independent contractor, to *refuse to hire or employ or contract with, or to bar or to discharge* from employment

*such individual* or independent contractor, or to otherwise discriminate against such individual or independent contractor with respect to compensation, hire, tenure, terms, conditions or privileges of employment or contract, if the individual or independent contractor is the best able and most competent to perform the services required.

43 P.S. § 955(a) (emphasis added).

5. Our Supreme Court adopted the *McDonnell Douglas* model in *General Electric Corp. v. Pennsylvania Human Relations Commission*, 469 Pa. 292, 365 A.2d 649 (1976). *McDonnell Douglas* was a refusal to hire case. However, the shifting burden of proof approach applies in any claim of employment discrimination, whether it involves an employee's discharge, compensation or terms of employment.

### Grant of a Non–Suit.

■ In his first issue, Garner asserts that the Commission erred in granting Comcast's motion for a non-suit because both sides presented evidence. In support, he directs the Court to *United States Postal Service Board of Governors v. Aikens*, 460 U.S. 711, 103 S.Ct. 1478, 75 L.Ed.2d 403 (1983).[6] In *Aikens*, the United States Supreme Court explained that

> when the defendant fails to persuade the district court to dismiss the action for lack of a *prima facie* case, and responds to the plaintiff's proof by offering evidence of the reason for the plaintiff's rejection ... the factual inquiry proceeds to a new level of specificity.

460 U.S. at 714–715, 103 S.Ct. 1478 (footnote and quotation omitted). Where a defense is presented, the Supreme Court held that the district court must "decide the ultimate factual issue in the case." *Id.* at 715, 103 S.Ct. 1478. Garner argues that under *Aikens* it was incumbent upon the Commission to reach the merits of his claim that his dismissal by Comcast violated the Act. Comcast and the Commission counter that *Aikens*, assuming its applicability to a proceeding before the Pennsylvania Human Relations Commission, did not establish that a tribunal must reach the merits of a discrimination claim in every case where both sides present evidence.

■ We agree that Garner's case is distinguishable from *Aikens*. The hearing examiner reserved his ruling on Comcast's motion for non-suit because one of Garner's witnesses had failed to arrive. Garner's case remained open during the entire time Comcast presented testimony, and Garner did not object to the hearing examiner's decision to defer ruling on Comcast's non-suit motion. The hearing examiner directed Comcast to proceed with its evidence in order to keep the proceeding moving forward, and Garner expressed no disagreement with this sensible ruling. Likewise, when the record finally closed, Garner made no objection to the hearing examiner's directive to the parties to address Comcast's motion for non-suit in their post-hearing briefs.[7]

■ Further, as explained by the Commission, the hearing examiner, unlike a federal district court, cannot rule on a dispositive motion such as a motion for non-suit. The hearing examiner is authorized to make recommended findings of fact and conclusions of law, but only the Commission is empowered to enter a final order, such as the grant of a non-suit. Section 9(g) of the Act states, in relevant part, as follows:

---

**6.** *Aikens* involved a case brought under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e–2000e–17. Generally, "[i]n interpreting the provisions of the [Pennsylvania Human Relations] Act, we are not bound by federal court decisions interpreting the similar or identical federal provisions contained in various federal civil rights acts." *Canteen Corporation v. Pennsylvania Human Relations Commission*, 814 A.2d 805, 811 n. 5 (Pa. Cmwlth.2003).

**7.** An "adjudication" is "[a]ny final order ... affecting personal or property rights, privileges, immunities, duties, liabilities or obligations of any or all of the parties to the proceeding...." 2 Pa.C.S. § 101. *See also, Wortman v. Philadelphia Commission on Human Relations*, 139 Pa.Cmwlth. 616, 591 A.2d 331, 332 (1991). The grant of a compulsory non-suit is a final order under the Administrative Agency Law. *Crawford v. Commonwealth*, 125 Pa.Cmwlth. 85, 556 A.2d 547, 548 (1989). The Administrative Agency Law requires that "[a]ll parties shall be afforded opportunity to submit briefs prior to adjudication by a Commonwealth agency." 2 Pa.C.S. § 506. Accordingly, it appears that the hearing examiner properly ordered briefs on the Comcast motion for non-suit.

The recommended findings, conclusions and order made by ... [a] permanent hearing examiner shall be reviewed and *approved or reversed by the Commission* before such order may be served upon the parties to the complaint.

43 P.S. § 959(g) (emphasis added). Therefore, even if circumstances had allowed Garner to present all his evidence before Comcast made its motion for a compulsory non-suit, the result would not have been different. The hearing examiner properly heard all the evidence and then requested briefs on the legal issues, including the Comcast motion.

■■■■ Garner also argues that the hearing examiner improperly adverted to the testimony of Proctor, a Comcast witness, in explaining his grant of the non-suit.[8] We agree that the testimony of a Comcast witness should not have been considered in analyzing the question of whether Garner had made out a *prima facie* case of discrimination. However, reversible error requires the determination "must not only be erroneous, but also harmful or prejudicial to the complaining party." *D.Z. v. Bethlehem Area School District*, 2 A.3d 712, 726 (Pa.Cmwlth.2010). "[A]n order of an administrative agency will not be disturbed for harmless error." *Id.* at 725–26. Because, as set forth below, the conclusion is the same with or without Proctor's testimony, this error is harmless.

In sum, *Aikens* is inapposite. Garner's argument simply fails to appreciate the difference between an administrative proceeding before the Commission and a judicial proceeding in federal district court. *Aikens* simply does not pertain to an administrative hearing conducted by a hearing officer who lacks the authority to grant a dispositive motion but can only make a recommendation. It does not purport to limit the manner in which a hearing is conducted.

### Evidence in a Mixed–Motives Claim of Discrimination.

■■■■ Garner asserts that the Commission dismissed his case because he did not present direct evidence of racial discrimination, which Garner argues was error. Garner reasons that in a mixed-motives complaint, such as his, direct evidence is not required. A mixed-motives complaint of discrimination is one where the employer has "a legitimate and an improper reason for [an employment] decision." *Taylor v. Pennsylvania Human Relations Commission*, 681 A.2d 228, 232 (Pa.Cmwlth.1996). In support, Garner directs the Court to *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 123 S.Ct. 2148, 156 L.Ed.2d 84 (2003). The Commission responds that Garner's reliance on *Desert Palace* is misplaced because *Desert Palace* did not relieve him of the responsibility to prove with some evidence, direct or indirect, that there was "an improper reason," *i.e.*, racial discrimination, for Comcast's decision to dismiss him. Garner did not prove an improper reason.[9]

---

8. That testimony and its significance is discussed in note 13, *infra*.

9. The Commission notes that Garner's argument that he was required to present direct evidence of discrimination is based not upon the adjudication but, rather, upon a statement made at the hearing by the hearing examiner. The hearing examiner stated that complainants have two ways to demonstrate intentional race-based discrimination: by presenting direct evidence, in accordance with *Price Waterhouse v. Hopkins*, 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989) or by indirect evidence, in accordance with *McDonnell Douglas*. The hearing examiner then explained that "since no direct evidence was presented, we turn to a disparate treatment analysis under the *McDonnell Douglas* proof formula...." R.R. 13a. This statement of the hearing examiner is not relevant. It is clear from the adjudication that the

Historically, a mixed-motives case required direct evidence of the "improper reason" or discrimination.[10] However, the U.S. Supreme Court later held that the plaintiff need not make a heightened showing through direct evidence in order to obtain a mixed-motive jury instruction. *Desert Palace,* 539 U.S. at 95, 123 S.Ct. 2148. Thus, in a mixed-motives case, the plaintiff may present direct or indirect evidence of discrimination. *Id.* Nevertheless, whether the plaintiff presents direct or indirect evidence, the plaintiff must present

> sufficient evidence to enable a reasonable jury to conclude that [discrimination] was either a motivating or determinative factor behind [the employer's] adverse personnel decisions.

*Prise v. Alderwoods Group, Inc.,* 657 F.Supp.2d 564, 588 (W.D.Pa.2009) (emphasis omitted). Once the plaintiff meets that burden, the employer can avoid liability by proving that it would have made the same decision, even if it had not taken into account the employee's protected class. *Id.* at 587 n. 6.

Garner argues that because Comcast's dismissal letter cited legitimate rea-sons for his dismissal, and Garner is a member of a protected class, his was a mixed-motives case. Thus, the Commission was required to determine whether Comcast's stated reasons for dismissing him were "unworthy of credence." Garner Brief at 26.[11] Garner's argument turns the mixed-motives analysis on its head. The Commission did not have to evaluate the credibility of Comcast's stated reasons for his dismissal because Garner never proved that race was a factor in Comcast's dismissal of Garner. A case is not a mixed-motives case simply because the employee who is the target of an employment action is the member of a protected class.

In any case, the Commission did not require Garner to present direct evidence of discrimination. In this regard, Garner mischaracterizes the adjudication. Garner had to prove that race was a factor in his dismissal, whether by direct or by circumstantial evidence, and he did not do so. Accordingly, once the Commission found Garner's evidence lacking in this regard, it properly declined to take the step of considering whether Comcast's stated reasons

Commission applied the correct standard, *i.e.,* whether Garner was terminated under circumstances that gave rise to an inference of discrimination.

10. "Direct evidence of discrimination is evidence that is so revealing of a discriminatory *animus* that it is not necessary for the plaintiff to rely on a presumption from his or her *prima facie* case to shift the burden of production to the defendant." *Prise v. Alderwoods Group, Inc.,* 657 F.Supp.2d 564, 587 (W.D.Pa. 2009). Examples of direct evidence so revealing of discriminatory *animus* are found in this Court's jurisprudence. In *The New Corey Creek Apartments, Inc. v. Pennsylvania Human Relations Commission,* 865 A.2d 277, 279 (Pa. Cmwlth.2004), direct evidence of racial discrimination in housing was shown by an apartment manager's statements that "this is the reason why N——s shouldn't live in a complex like this" and "that's why monkeys deserve to be back in Africa." Similarly, in *Montour School District v. Pennsylvania Human Relations Commission,* 109 Pa.Cmwlth. 1, 530 A.2d 957 (1987), direct evidence of age discrimination was established in letter from employer school district to claimant, a school bus driver, that he was discharged because he had reached age 70.

11. Garner suggests that *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), supports his claim. However, in *Burdine,* the U.S. Supreme Court held that the employer only bears the burden of providing nondiscriminatory reasons for its actions, "[w]hen the plaintiff has proved a *prima facie* case of discrimination." *Id.* at 260, 101 S.Ct. 1089.

for Garner's dismissal were worthy of belief. In short, the Commission did not err.

### Statistical and Comparator Evidence.

 Garner argues that the comparator and statistical evidence he offered showed that "a discriminatory reason more likely motivated the employer." Garner Brief at 26 (quoting *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 256, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)). Garner argues that his evidence showed that he was treated differently from similarly situated employees, which constitutes powerful proof of intentional discrimination. Specifically, he argues that his statistical evidence showed that African–American employees were terminated at a greater rate than white employees, which established a pattern of discrimination.

Garner's evidence consisted of testimony that employees routinely used equipment for personal use but were not terminated. He also presented documentary evidence showing that two white employees committed theft offenses but were not terminated.

The Commission agreed with the hearing officer's finding that Garner's evidence showed that Service and Line Technicians took their tools home after work and used them for personal reasons. However, Garner's evidence also showed that no employee, other than Garner, left their tools at home or took them to another location for weeks at a time; rather, employees returned them to the truck for use at work the following day. In short, the hearing examiner found that Garner did not show that his situation was similar to that of any other employee.

Likewise, the hearing examiner was not persuaded by Garner's documentary evidence, *i.e.*, Complainant Exhibits 10 and 11, that two white employees, who committed theft and were not dismissed, but only

given written warnings, demonstrated discrimination on Comcast's part. First, the warnings in question had been issued six years prior to Garner's termination, making them too remote in time to be relevant. Second, each warning was the first discipline for each employee. By contrast, Garner was dismissed after being disciplined many times and after being issued a written warning that his next discipline could be a termination.

We agree with the Commission that Garner's comparator evidence did not establish that he was treated differently from similarly situated white employees. Simply, Garner did not produce an example of an employee with a disciplinary record similar to his own who was not terminated following that employee's unauthorized use of Comcast's property.

This leaves us with Garner's statistical evidence. That evidence consisted of two exhibits. Complainant Exhibit 9 showed that at a single point in time, *i.e.*, May of 2005, Comcast employed 693 persons in the "Philadelphia and Suburban system," of which 28% were African–American. Between May 2003 and May 2005, a two-year period of time, 79 employees were terminated. Of this total, 30 employees, or 40%, were African–American. Complainant Exhibit 13 provided a breakdown of the employees in the "Willow Grove and Philadelphia Area," where 227 people were employed. Of that total, 44% were African–American.

Garner did not present expert testimony to explain the significance of any of these statistics. His lawyer argued that because 40% of those terminated from Philadelphia and suburbs over two years were African–American, and 28% of the workforce, at least in May 2005, was African–American, the data demonstrated intentional discrim-

ination.[12] The hearing examiner rejected that logic, reasoning that the relevant data were those relating to the "Willow Grove and Philadelphia Area," where Garner worked. In that area, 44% of the workforce was African–American, which did not vary significantly from 40% of the terminations in the "Philadelphia and Suburban system." Garner argues that the hearing examiner compared apples to oranges by relating employee data for all of Philadelphia and suburbs to the smaller employee pool in Philadelphia and Willow Grove. The Commission and Comcast argue that regardless of what population base is used, the numbers on Complainant Exhibit 9 are meaningless.

We turn to *Lilly v. Harris–Teeter Supermarket*, 720 F.2d 326 (4th Cir.1983), a case that all parties cite in support of their respective positions. In *Lilly*, the plaintiff made out a *prima facie* case of discrimination with statistical evidence showing that the workforce was 15.7% African–American, but 28% of those terminated were African–American. However, the plaintiffs in *Lilly* also produced an expert in statistics who testified about standard deviations. The expert's testimony "conclusively ruled out chance as the cause of the disparity in the termination rates." *Lilly*, 720 F.2d at 336. A standard deviation in excess of two or three eliminates the possibility that the percentages were the product of chance; in *Lilly*, the standard deviation relating to dismissal of African–American employees was 9.71, which ruled out chance. *Id.* at 337.

Garner did not present an expert to explain the data presented in his statistical exhibits. Garner did not show, or explain, why it was valid to use data as of a single point in time, May of 2005, and compare that information to data covering a two-year period of time. Garner did not offer evidence to explain whether the May 2005 employment number of 693 and the racial composition thereof was high, low or typical of the total workforce over the two-year period from 2003 to 2005. Garner did not prove that the numbers presented, *i.e.*, a population of 693, and the numbers of African–American employees dismissed over a two-year period, *i.e.*, 30, represented a large enough sampling to support any inference. Garner did not present evidence to rule out chance because, apparently, it could not be done. Applying the binomial model used by the experts in *Lilly*, the Commission calculates the standard deviation to be 1.627, which is too low a deviation to rule out chance.

At oral argument, Garner cited to *Palmer v. Shultz*, 815 F.2d 84 (U.S.App.D.C. 1987), in support of his use of statistical evidence. There, the court explained that there were different methods under which to analyze data; noting that each method measured probability in different ways, with differing results. *Palmer* explained that in analyzing data, one must consider the appropriate labor pool; what statistical methodology should be applied; and whether the sample is large enough so that the probability that the disparities resulted from chance is sufficiently small. *Id.* at 91–93. Garner's evidence addressed none of these points.

Garner did not address the sample size and how it affected probability. Nor was there any evidence presented, expert or otherwise, to explain what particular statistical methodology should be employed to evaluate the data presented in Complain-

---

**12.** The hearing examiner noted that the "Philadelphia and Suburban system" appeared to encompass Willow Grove, as well as other suburbs. However, the exhibit did not specify what area was covered in the "Suburban system," which reduced the probative value of Complainant Exhibit 9.

ant Exhibits 9 and 13. Garner did not rule out chance with standard deviation analysis. In short, *Palmer* does not support Garner but, rather, the Commission with respect to its conclusion about the lack of value in Garner's statistical evidence.

We hold that the Commission did not err in holding that Garner's statistical evidence, consisting of nothing more than raw numbers, did not support an inference of discrimination.[13]

### Conclusion.

Garner was dismissed for misappropriation of an A-frame ladder, which Garner asserts he did thoughtlessly and without intention to burden another employee. This conduct appears less serious than his prior instances of misconduct, such as driving a company-owned vehicle under the influence of cocaine. Comcast could have chosen to give Garner another chance after the ladder incident, but it did not. The role of the Commission is not to act as the "super personnel department," as was aptly observed in the Commission's adjudication. The Commission's job is to enforce the law against racial discrimination in the workplace. Garner's evidence showed that his employer ran out of patience, but it did not show that he was discharged for circumstances that give rise to an inference of racial discrimination.

13. Garner argues that the Commission erred in considering Comcast's evidence when determining whether to grant non-suit. In its decision, the Commission credited the testimony offered by Proctor that Comcast had undertaken an initiative to hire minorities, which increased the percentage of new hires that were African–American. Proctor also stated that new hires are more vulnerable to dismissals than seasoned employees. Any study of statistics had to account for Comcast's increased hiring of African–Americans, according to Proctor.

We agree that in deciding Comcast's motion for a non-suit, the Commission had to look at the evidence in the light most favor-

For these reasons, we affirm the Commission's order.

### ORDER

AND NOW, this 24th day of February, 2011, the order of the Pennsylvania Human Relations Commission dated January 26, 2010, is hereby AFFIRMED.

able to Garner. *Asbury v. Port Authority Transit of Allegheny County*, 863 A.2d 84, 88 n. 4 (Pa.Cmwlth.2004). Crediting testimony presented by Comcast is not considering the evidence in the light most favorable to Garner. However, this error by the Commission does not change the outcome of the case because Garner had the burden to establish a *prima facie* case, and he failed to do so. *See Johnson v. Unemployment Compensation Board of Review*, 869 A.2d 1095, 1117 (Pa. Cmwlth.2005), *petition for allowance of appeal denied*, 585 Pa. 699, 889 A.2d 90 (2005) (an improper finding that does not affect the outcome of the case constitutes harmless error).