# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

John R. Anthony, Sr., : 
                 Petitioner : 
                           : 
              v. :   No. 410 C.D. 2017
                           :   Submitted: December 22, 2017
State Civil Service Commission : 
(Torrance State Hospital), : 
                Respondent : 

BEFORE:    HONORABLE RENÉE COHN JUBELIRER, Judge
                HONORABLE P. KEVIN BROBSON, Judge
                HONORABLE DAN PELLEGRINI, Senior Judge

**OPINION NOT REPORTED**

MEMORANDUM OPINION BY
JUDGE COHN JUBELIRER              FILED: March 5, 2018

John R. Anthony, Sr., (Petitioner) petitions for review of the Order of the State Civil Service Commission (Commission) that dismissed his appeal from a one-day suspension from his regular position as a psychiatric aide by Torrance State Hospital (Appointing Authority) and sustained Appointing Authority's one-day suspension of Petitioner. On appeal, Petitioner argues the Commission erred in dismissing his appeal because he set forth a valid claim that his discipline was motivated by his race and not merit-based factors. Discerning no error, we affirm.

The majority of the facts in this matter are undisputed and are as follows. Petitioner is a regular status, psychiatric aide for Appointing Authority, which provides care for psychiatrically challenged individuals. On February 20, 2016,

Petitioner worked the 11:00 p.m. to 7:00 a.m. shift and was assigned to provide one-to-one constant visual observation[1] (one-to-one care) to a patient (Patient). Patient is unsteady on her feet and has a history of falling and injuring herself and, therefore, one of Appointing Authority's physicians (Physician) ordered one-to-one care for Patient on February 20 and 21, 2016. Because of Patient's history, her room has padding on the walls, floors, and bed, except for one corner several feet in width, which is near where Patient keeps her shoes.

During Petitioner's shift, Patient got out of bed at around 1:30 a.m. and looked for her shoes, and Petitioner told her it was not time to get up and helped her back to bed. Patient did not fall, trip, or injure herself at this time. Between 2:00 a.m. and 2:30 a.m., Patient had to use the bathroom and was assisted by Petitioner and a second psychiatric aide (Aide T.R.). Patient "was pleasant and laughing," and neither Petitioner nor Aide T.R., nor a third psychiatric aide (Aide L.P.), observed any bleeding or injuries on Patient's face. (Adjudication, Findings of Fact (FOF) ¶¶ 20-21.) Aide T.R. relieved Petitioner from 3:00 a.m. to 3:30 a.m. while he took his assigned break; Patient remained in her bed during this time. "At some time between 3:30 AM and 6:10 AM, [Patient] was out of her bed looking for her shoes a second time. [Patient] was not bleeding at that time." (*Id*. ¶ 26.)

---

[1] One-to-one care requires that one staff member be dedicated to constantly observing one patient and to remain with the patient for the staff member's entire shift, excluding break times. The patient must be in the staff member's direct eyesight. When the one-to-one care assignment occurs overnight, such as the one here, the staff member sits in the patient's room or in the hallway right outside the room, no more than 10-feet away from the patient, and observes the patient sleeping. Although the patient's room is dark, the hallway lighting provides sufficient light for the staff member to see into the room to ensure that "the patient is asleep or, if awake, does not need anything." (Adjudication, Findings of Fact (FOF) ¶¶ 7-8.) The staff member is required to record the patient's behavior every 30 minutes, including whether intervention was required and, if so, the patient's reaction to that intervention.

However, when the unit's on-duty Registered Nurse (RN) and Aide L.P. came into the room to tend to Patient's morning needs at around 6:10 a.m., Aide L.P. pulled Patient's sheet back and discovered Patient actively bleeding from a laceration on her left eyelid, a contusion or "friction kind of abrasion" on her cheek, and a cut on her forehead. (*Id.* ¶¶ 27, 29-30, 43-44, 53.) Patient could not explain what happened. After providing immediate care for Patient's fresh injuries, RN called for Physician, who, after examining Patient, ordered Patient to be taken by ambulance to the emergency room for additional care. Based on the nature of Patient's injuries, Physician indicated that the injuries could not be self-inflicted from scratching, and were not from blunt force trauma, but could have occurred if Patient fell while standing, even if she fell where the room was padded. (*Id.* ¶¶ 53-54.) Physician drafted a Progress Report stating that Patient had a "Fall unobserved – nightshift" and that she was concerned about the injuries not being discovered by Petitioner, Patient's one-to-one staff member. (*Id.* ¶¶ 53-56.)

On Monday, February 22, 2016, Physician informed Appointing Authority's Chief Nurse Executive (Chief Nurse) of Patient's injuries and her concerns regarding when the injuries were discovered. Chief Nurse directed that the incident be investigated. Witness statements were collected, and a pre-disciplinary conference was held on May 4, 2016. Thereafter, Appointing Authority notified Petitioner by letter dated May 13, 2016, that he was suspended for one day based on the charge of:

> Non-Physical Patient Abuse-Neglect (as defined in Department Policy Section 7178). Specifically, on February 21, 2016, between the hours of 3:30 a.m. to [sic] 6 a.m., when you did not visually observe a patient to whom you were assigned for one-to-one observation regarding fall risks and that patient then fell and sustained facial injury.

3

(FOF ¶ 1; Certified Record (C.R.) at Item 1, Comm'n Ex. A.)

Petitioner filed an appeal with the Commission under Section 951(a) and (b) of the Civil Service Act,[2] 71 P.S. § 741.951(a), (b). (Reproduced Record (R.R.) at 2a-3a; FOF ¶ 2.) Petitioner asserted his discipline was based on his race and/or retaliation for his filing complaints against Appointing Authority. He also challenged the merit-based reason proffered for his suspension. (R.R. at 2a-3a.) A hearing was held, at which Appointing Authority presented the testimony of, among others, RN, Aide L.P., Physician, Chief Nurse, and its HR director.[3] Petitioner offered his own testimony, along with that of another psychiatric aide and Petitioner's union representative, Aide M.P.[4]

In addition to the above-stated facts, Appointing Authority's witnesses testified, relevantly, as follows. RN testified Petitioner was Patient's primary observer during the nightshift and was required to keep her in his direct eyesight. RN indicated that, after being asked if Patient had fallen, Petitioner said he had not seen Patient fall and was surprised by Patient's injuries. Aide L.P. testified when she and RN entered the room Petitioner was sitting in the one-to-one chair and, when she asked Petitioner what happened, Petitioner said Patient "must have fallen when she was up earlier looking for her shoes." (FOF ¶¶ 28, 31-32.) When she asked again, Petitioner stated he did not know what had happened.

Physician explained she was particularly concerned about the fact that Patient's injuries were discovered by the morning care nurse and not by Petitioner,

---

[2] Act of August 5, 1941, P.L. 752, added by Section 27 of the Act of August 27, 1963, *as amended*, 71 P.S. § 741.951(a), (b).

[3] Aide T.R. and a Nurse Manager who had participated in the pre-disciplinary conference also testified on Appointing Authority's behalf.

[4] Petitioner also presented the testimony of Therapeutic Services Activity Worker, M.M., who is familiar with Patient's tendencies.

the staff member responsible for Patient's one-to-one care, and who should have noticed the injuries if he had been constantly observing Patient. According to Physician, the purpose of one-to-one care is to prevent a patient from being injured or, if injured, to ensure that the patient receives immediate medical care.

Chief Nurse testified Petitioner had received training on providing one-to-one care and she, too, was concerned that the person who was assigned to provide that care to Patient had not noticed that Patient had been injured. She indicated that, following the investigation, an executive team reviewed the information and agreed to suspend Petitioner for one day. Chief Nurse stated neither Petitioner's race nor his prior claims were a factor in imposing the suspension. She did not recall if anyone else had been disciplined following an injury to Patient, and she was unaware of how many African Americans worked on the psychiatric unit. HR director similarly testified race was not a factor or consideration in the investigation or Petitioner's discipline, and there was no retaliation due to Petitioner's prior appeals, complaints, or grievances. He explained numerous people and offices were involved in deciding to discipline Petitioner, and the one-day suspension was no different from the discipline that would be given to other staff members in a similar situation.

In support of Petitioner's appeal, Aide M.P. testified about Patient's history of falls and injuries and, that to his knowledge, no other staff member involved in Patient's care had been disciplined. According to Aide M.P., approximately five or six of Appointing Authority's psychiatric employees are African American.

Petitioner testified that he was awake and observed Patient the entire time and at no point did he see Patient fall or trip and injure herself. He indicated he did not know how Patient was injured. Petitioner explained that, because Patient sleeps with the covers over her head, he could not have observed any injuries that she might

5

have inflicted upon herself during that time period. He further explained that, if something unusual would have happened, he would have immediately alerted someone, but there was nothing unusual about Patient's movements that night. With regard to his claim that his discipline was based on racial discrimination, Petitioner testified that he is 1 of 4 African Americans employed by Appointing Authority on its psychiatric staff of 75. He stated that Patient has been more seriously injured and no other staff member has ever been disciplined as a result of Patient being injured. Without providing specific details, Petitioner stated he had filed a racial discrimination and retaliation action against Appointing Authority, which was currently proceeding in the United States District Court.

After reviewing the record, the Commission concluded that Petitioner did not meet his burden of proving a *prima facie* case that his discipline was the result of discrimination based on his race or in retaliation for his filing complaints against Appointing Authority. On the racial discrimination claim, the Commission held that Petitioner's sole statement with respect to his race, that only 4 of the 75 employees on the unit are African American, "did not establish a nexus between his race and the discipline at issue." (Adjudication at 13, citing *Henderson v. Office of the Budget*, 560 A.2d 859 (Pa. Cmwlth. 1989).) It further concluded that Petitioner's assertion that no other employee has been disciplined when Patient had been injured or fallen in the past was insufficient to support a *prima facie* case of discrimination because he "did not present any testimony or evidence of other employees who were responsible for [Patient's] care when she sustained [the] alleged previous injuries." (*Id.* at 14.) On the retaliation claim, the Commission found no merit to Petitioner's allegations. The Commission concluded, *inter alia*, that it was unable to determine whether there was any retaliation based on the filing of a lawsuit or the outcome of

6

a lawsuit because Petitioner presented no evidence of his alleged lawsuits against Appointing Authority, the allegations made therein, or the final results thereof. (*Id.* at 15.)

Finally, the Commission held that Appointing Authority presented sufficient evidence demonstrating that it had good cause for suspending Petitioner for negligent patient abuse. (*Id.* at 19.) Crediting the testimony of RN, Aide L.P., and Physician, the Commission determined that Patient's severe injuries were fresh when discovered around 6:00 a.m. and concluded that Petitioner's "lack of continuous one-to-one observation of an at-risk patient at the very least allowed . . . [P]atient's injuries to go untreated for an unknown period of time." (*Id.*) Noting that "[g]ood cause must relate to an employee's competence and ability to perform his job duties," "or must result from conduct that hampers or frustrates the execution of the employee's duties," the Commission concluded that Petitioner's "negligent care clearly reflect[ed] negatively upon his competency and ability to perform his job duties." (Adjudication at 16-17, 19, citing *Dep't of Corr. v. Ehnot*, 532 A.2d 1262 (Pa. Cmwlth. 1987); *McCain v. Dep't of Educ.*, 454 A.2d 667 (Pa. Cmwlth. 1983).) The Commission pointed out that Petitioner was not disciplined because Patient was injured, "but for not being immediately aware of the injuries the moment they occurred as he should have been if he were properly executing his job duties." (*Id.* at 19 n.3.) Therefore, it held, Appointing Authority had good cause for imposing the one-day suspension.

For these reasons, the Commission dismissed Petitioner's appeals and sustained Appointing Authority's one-day suspension. Petitioner petitioned this Court for review of the Commission's Order.[5]

On appeal, Petitioner summarily argues that his suspension was motivated by racial discrimination and his testimony that there are only 4 African-American employees out of 75 employees on his unit and that no one else has been disciplined when Patient was injured satisfied his burden of proving discrimination under the Civil Service Act.[6] He further appears to assert that the Appointing Authority's reason for the suspension was pre-textual. Appointing Authority responds that Petitioner's testimony falls short of establishing a *prima facie* claim for discrimination and, even if he had established such a claim, it had merit-based, *i.e.*, good cause, reasons for imposing the one-day suspension.

Section 951 of the Civil Service Act, which addresses civil service employees' appeal rights, provides, in relevant part:

> (a) Any regular employe in the classified service may, within twenty calendar days of receipt of notice from the appointing authority, appeal in writing to the commission. Any permanent separation, suspension for cause, furlough or demotion on the grounds that such action has been taken in his case in violation of the provisions of this act, upon receipt of such notice of appeal, the commission shall promptly schedule and hold a public hearing.

> (b) Any person who is aggrieved by an alleged violation of section 905.1 of this act may appeal in writing to the commission within twenty calendar days of the alleged violation. Upon receipt of such notice of

---

[5] "This Court's . . . review requires us to affirm the . . . Commission's adjudication unless necessary findings are unsupported by substantial evidence, an error of law was committed, or the petitioner's constitutional rights were violated." *Henderson*, 560 A.2d at 862 n.6.

[6] Petitioner does not include any argument based on the Commission's rejection of his retaliation claim and, therefore, that issue is not before the Court.

8

appeal, the commission shall promptly schedule and hold a public hearing.

71 P.S. § 741.951(a), (b).  Section 905.1 of the Civil Service Act states:

No officer or employe of the Commonwealth shall discriminate against any person in recruitment, examination, appointment, training, promotion, retention or any other personnel action with respect to the classified service because of political or religious opinions or affiliations because of labor union affiliations or because of race, national origin or other non-merit factors.

71 P.S. § 741.905a.[7]

Petitioner asserts he established that his one-day suspension was based on his race and, therefore, violated Section 905.1, which is considered a "traditional discrimination" claim.[8]  We briefly review the legal framework in which to analyze "traditional discrimination" claims.  In traditional discrimination cases, the burden is on the petitioner to "make out a *prima facie* case of discrimination . . . by producing sufficient evidence" that "if believed and otherwise unexplained, indicates that more likely than not discrimination has occurred." *Dep't of Health v. Ngwogwugwu*, 594 A.2d 847, 849 (Pa. Cmwlth. 1991).  If the petitioner proves "a *prima facie* case, a presumption of discrimination arises which, if not rebutted by the appointing authority, becomes determinative of the factual issue of the case." *Id.* "Given the critical role of circumstantial evidence in discrimination proceedings, the *prima facie* case cannot be an onerous one." *Id.* at 850.  It can be established by presenting evidence that the petitioner was treated differently than a similarly situated co-worker. *State Corr. Inst. at Graterford, Dep't of Corr. v. Morse*, 596

---

[7] Section 905.1 was added by Section 25 of the Act of August 27, 1963, P.L. 1257.

[8] "Traditional discrimination" encompasses "only those claims of discrimination based on race, sex, national origin, or the like." *Dep't of Health v. Ngwogwugwu*, 594 A.2d 847, 849 n.4 (Pa. Cmwlth. 1991).

A.2d 897, 899 n.4 (Pa. Cmwlth. 1991) (stating the petitioner met his *prima facie* case "merely by showing that he was discharged and the white employee involved in the same fight was treated differently").

If the petitioner meets this initial burden, "the burden of production shifts to the appointing authority to clearly advance a legitimate non-discriminatory reason for removal through the introduction of admissible evidence." *Ngwogwugwu*, 594 A.2d at 850. However, the appointing authority is not required, as part of its burden, to persuade the Commission that "it was actually motivated by the proffered reason or reasons. All that is required is that the [appointing authority's] evidence raise a genuine issue of fact as to whether it discriminated against the complainant." *Henderson*, 560 A.2d at 864 (citing *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248 (1981)). "Once the *prima facie* case is rebutted, the presumption of discrimination drops from the case." *Ngwogwugwu*, 594 A.2d at 850. At that point, the petitioner, "who retains the burden of persuasion throughout must then demonstrate, by a preponderance of the evidence, that the proffered merit reason for dismissal is merely a pretext." *Id.* (citing *Burdine*, 450 U.S. at 255–56). The petitioner "'may succeed in this either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence.'" *Id.* at 850-51 (quoting *Burdine*, 450 U.S. at 256).

We now apply this legal framework to the facts of this case. The evidence Petitioner presented to prove his *prima facie* case was that he was 1 of 4 African Americans amongst Appointing Authority's 75 employees, or approximately 5%, on that unit and that Patient had been injured in the past, but no one else was ever disciplined as a result. While the burden of proving a *prima facie* case of traditional

discrimination is not intended to be onerous, *Henderson*, 560 A.2d at 864, we agree with the Commission that Petitioner's evidence does not meet that burden.

In *Garner v. Pennsylvania Human Relations Commission*, 16 A.3d 1189 (Pa. Cmwlth. 2011), this Court addressed the use of statistical evidence to establish a *prima facie* case that a petitioner's discharge was the result of racial discrimination under Section 5(a) of the Pennsylvania Human Relations Act.[9] There, the petitioner presented statistics suggesting a disparity in the number of African Americans employed and the number of African Americans discharged compared with white employees. Fewer African Americans were employed, but four percent more were discharged than white employees during a particular time period. *Garner*, 16 A.3d at 1202. We held, however, that the statistics, without expert testimony explaining their significance or relationship to the alleged discrimination, did not satisfy the petitioner's burden of presenting a *prima facie* case. *Id.* at 1202-03. Like the petitioner in *Garner*, Petitioner here did not present expert testimony about why the fact that he was only one of four African Americans on the unit made it "more likely than not discrimination . . . occurred" when Appointing Authority suspended him for one day. *Ngwogwugwu*, 594 A.2d at 850. Moreover, unlike the statistical

_____

[9] Act of October 27, 1955, P.L. 744, *as amended*, 43 P.S. § 955(a). Similar to Section 905.1 of the Civil Service Act, Section 5(a) of the Pennsylvania Human Relations Act makes it unlawful for, *inter alia*, an employer to, based on an individual's race,

> . . . refuse to hire or employ or contract with . . . or to discharge from employment . . . or to otherwise discriminate against [an] individual . . . with respect to compensation, hire, tenure, terms, conditions or privileges of employment or contract, if the individual . . . is the best able and most competent to perform the services required.

43 P.S. § 955(a). We apply the same standard of proof in cases brought under Section 5(a) of the Pennsylvania Human Relations Act as those filed under Section 905.1 of the Civil Service Act. *Henderson*, 560 A.2d at 863-64.

11

evidence in *Garner*, which addressed disciplinary actions taken by the employer in terms of employee race, Petitioner's statistical evidence bears no relationship to any disciplinary action taken by Appointing Authority. "Discrimination cannot be inferred . . .; rather, there must be some affirmative support adduced to sustain the allegations of discrimination." *Masneri v. State Civil Serv. Comm'n (W. Center, Dep't of Pub. Welfare)*, 712 A.2d 821, 823 (Pa. Cmwlth. 1998). Here, the fact that Petitioner was one of four African-American employees in this unit, without more, does not constitute affirmative support that his one-day suspension was the result of his race. Therefore, the Commission correctly concluded that Petitioner did not establish a *prima facie* case of racial discrimination based on this evidence.

With regard to Petitioner's testimonial evidence that no other employee had been disciplined when Patient had fallen and sustained injuries in the past, there was no evidence that those injuries occurred while Patient was under one-to-one care and went undiscovered resulting in a delay in treatment. Further, Petitioner presented no evidence regarding the race of the employees who allegedly went undisciplined following those falls or injuries. Absent such evidence, Petitioner was unable to establish that similarly situated employees were treated differently for the same or similar conduct. *See Henderson*, 560 A.2d at 864 (holding that the petitioner established a *prima facie* case by presenting evidence that he was African American, was removed from a probationary position for which he was qualified, none of the white trainees were removed, and a greater tolerance was shown for the white employees' performance shortcomings). Accordingly, the Commission correctly concluded that Petitioner did not establish a *prima facie* case of discrimination based on disparate treatment.

12

Even if Petitioner had established a *prima facie* case, the burden would then have shifted to the Appointing Authority to present a legitimate, non-discriminatory reason for Petitioner's one-day suspension. *Nwogwugwu*, 594 A.2d at 850. Because Petitioner is a regular status employee, Appointing Authority had the burden of proving good cause for suspending Petitioner as required by Section 803 of the Civil Service Act, 71 P.S. § 741.803.[10] *See Hargrove v. Pa. State Civil Serv. Comm'n*, 851 A.2d 257, 260 (Pa. Cmwlth. 2004) (holding that the appointing authority bears the burden of proving good cause for the suspension of a civil service employee). Good cause "has been interpreted as merit-related and touching upon the employee's competency to do the job in some rational and logical manner." *Id.* For example, an "employee's conduct of failing to properly execute [the employee's] duties, or hampering or frustrating the execution of th[ose] duties constitutes good cause to suspend the employee." *Id.*

"The [C]ommission is the sole fact finder, and the resolution of evidentiary conflicts and determinations as to witness credibility are within its exclusive province." *Masneri*, 712 A.2d at 825. Here, the Commission credited Appointing Authority's evidence that Patient was not injured when Aide T.R. left her at around 3:30 a.m. but was discovered injured and bleeding in her bed at approximately 6:10 a.m. Because of the nature of Patient's injuries, which Physician explained were more consistent with a fall rather than self-infliction, (Supplemental Reproduced Record (S.R.R.) at 30b-31b), it was reasonable to infer[11] that Patient was injured in

---

[10] Section 803 of the Civil Service Act states, in relevant part, "[a]n appointing authority may for good cause suspend without pay for disciplinary purposes an employe holding a position in the classified service." 71 P.S. § 741.803.

[11] In reviewing the Commission's decisions, "we view the evidence and all reasonable inferences arising therefrom in the light most favorable to . . . the prevailing party" before the Commission. *Bosnjak v. State Civil Serv. Comm'n*, 781 A.2d 1280, 1286 (Pa. Cmwlth. 2001).

a fall between 3:30 a.m. and 6:00 a.m. Petitioner was the only staff member responsible for observing Patient during that time period, and he admitted he did not see Patient fall and did not know what had happened. (*Id.* at 52b.) However, Petitioner's work duties required him to constantly observe Patient overnight, and the fact that the fall was unobserved and unreported supports the Commission's conclusion that Petitioner's "obvious lack of continuous one-to-one observation of an at-risk patient at the very least allowed the patient's injuries to go untreated for an unknown period of time." (Adjudication at 19.) As such, Petitioner did not properly execute his work duties that night and, in not doing so, frustrated the purpose of his assignment to prevent, if possible, an injury from occurring and, if an injury did occur, to ensure that immediate medical care was provided. We, therefore, agree with the Commission that Appointing Authority met its burden of proving good cause to suspend Petitioner because his conduct "clearly reflects negatively upon his competency and ability to perform his job duties," (*id.*), "in some rational and logical manner," *Hargrove*, 851 A.2d at 260.

Because Petitioner's not properly executing his work duties to provide one-to-one care to Patient on February 20 and 21, 2016, was good cause for suspending him for one day, this rebutted any *prima facie* case established. Although Petitioner argues this reason was pre-textual, the Commission was not persuaded by that argument, and neither are we, where good cause existed for the suspension.

Accordingly, because Petitioner did not present a *prima facie* case of racial discrimination and Appointing Authority had good cause for suspending Petitioner for one day, the Commission's Order is affirmed.

_____
**RENÉE COHN JUBELIRER,** Judge

14

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

John R. Anthony, Sr.,                     :
                        Petitioner        :
                                          :
            v.                            :      No. 410 C.D. 2017
                                          :
State Civil Service Commission            :
(Torrance State Hospital),                :
                        Respondent        :

# **O R D E R**

**NOW**, March 5, 2018, the Order of the State Civil Service Commission, entered in the above-captioned matter, is **AFFIRMED**.


_____
**RENÉE COHN JUBELIRER,** Judge